UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

IN RE:                                          Case No.: 6:19-bk-04049-CCJ
                                                Chapter 7

EDITH ALEXANDRA HINOJOSA CORDOVA,

     Debtor.

_____/

INSIGHT SECURITIES, INC., and the
Parties Listed on Exhibit B to this Complaint

     Plaintiffs,                              Adv. Proc. No.:

vs.

EDITH ALEXANDRA HINOJOSA CORDOVA,

     Defendant.

_____/

**COMPLAINT FOR DETERMINATION OF DISCHARGEABILITY AND
OBJECTING TO DEBTOR'S DISCHARGE PURSUANT TO
SECTIONS 523 AND 727 OF THE BANKRUPTCY CODE**

COME NOW, the Plaintiffs, Insight Securities, Inc., Integra Limited, Golden Riva, Vincenzo Caccio, José Fernández, Fanny Maldonado, Luis Fernando Guzman, Carmen Vivanco, Oscar Erraez, Marco Rivadeneira, Luis Enriquez, Luis Dávila, Veronica Hinojosa, José De La Torre, Luz Pazmiño, Roberto Javier Vernaza, Samuel Sánchez, Stalin Villafuerte, Maria Riofrio, and Maria Calero, (collectively the "**Plaintiffs**"), by and through their undersigned counsel, and sue the Debtor, Edith Alexandra Hinojosa Cordova ("the **Debtor**"), and allege:

## JURISDICTION

1.      On June 20, 2019, the Debtor filed a voluntary petition (the "**Petition**") for relief under Chapter 7 of Title 11 of the United States Code.

2.      The Debtor's bankruptcy case was assigned Case No. 6:19-bk-04049-CCJ.

3.      The Debtor's bankruptcy case is pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

4.      The Court appointed Richard B. Webber as the Trustee of the Debtor's bankruptcy case.

5.      On July 25, 2019, the Debtor's first duly-noticed meeting of creditors was held pursuant to Section 341(a) of the Bankruptcy Code and such meeting was concluded on August 22, 2019 (collectively, the "**Section 341 Meeting**").

6.      As of the date of this Complaint the Debtor has not been granted a discharge of her debts.

7.      This Complaint is timely because the date by which a Complaint objecting to the Debtor's discharge or to determine dischargeability of a debt expires on September 23, 2019.

8.      This is an adversary proceeding in which the Plaintiffs are creditors who are objecting to the Debtor's discharge under Bankruptcy Code §§727(a)(3), 727(a)(4)(A) and (B), 727(a)(5) and 727(a)(7) and are seeking a determination as to the non-dischargeability of the debts owed by the Debtor to the Plaintiffs under Bankruptcy Code §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6).

9.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and Bankruptcy Code §§ 523 and 727.

10.     This case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and 157(b)(2)(J).

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409 and other applicable law.

## PARTIES AND FACTUAL BACKGROUND

### A.     The Plaintiffs

### (i) Insight Securities, Inc.

12.     Plaintiff Insight Securities, Inc. ("**Insight**") is a Delaware Corporation registered as a securities broker/dealer with the Financial Industry Regulatory Authority ("**FINRA**") with its principle place of business located in Highland Park, Illinois.

13.     Plaintiff Insight is a creditor of the Debtor by virtue of, among other things, its claims asserted in a pre-petition action entitled *Insight Securities, Inc. v. Edith Alexandra Hinojosa Cordova*, in the United States District Court for the Northern District of Illinois, Index No. 18-CV-07572 (the "**Illinois Complaint**"), seeking compensatory damages of in excess of one million dollars ($1,000,000), plus fees and punitive damages of three million dollars ($3,000,000). A copy of the Illinois Complaint is attached hereto as **Exhibit A**. The Illinois Complaint seeks (i) contribution for the damages caused by the Debtor when she sold worthless securities to her clients in Ecuador and opened accounts at Insight to hold such securities for her clients, and (ii) compensatory and punitive damages for defamation and unfair business practices. Some of the Debtor's many investor victims are co-Plaintiffs herein. In addition to the claims asserted in the Illinois Complaint, Insight has contribution claims related to a FINRA arbitration commenced in August of 2019 against Insight by a number of Debtor's former clients (other than the Investor

Plaintiffs)      asserting      losses      in      excess      of      $23      million.

**(ii) The Investor Plaintiffs**

14.     The other Plaintiffs are listed for convenience on **Exhibit B** attached

hereto, (each an "**Investor Plaintiff**" and collectively, the "**Investor Plaintiffs**") are each

investors who purchased securities issued by the Biscayne Entities (defined below) based

on solicitations and recommendations of their investment advisor, the Debtor. The Debtor

opened brokerage accounts in the United States for the Investor Plaintiffs at the respective

institutions set forth on Exhibit B, had signature and trading authority in and managed those

accounts on behalf of her clients. As more fully described below, the securities at issue

were part of a massive Ponzi scheme the Debtor profited from and helped perpetuate,

deploying false, misleading and fraudulent oral and written representations regarding the

securities.

15.     **Exhibit B**, whose contents are incorporated herein, sets forth the name of

each Investor Plaintiff, the brokerage institution and account number where the

investments are held, and the face value of the worthless Biscayne Notes representing

losses incurred by each Investor Plaintiff by virtue of such holdings. Aside from Plaintiff

Integra Limited, which is a company based in Coral Gables, Florida, the other Investor

Plaintiffs are individuals residing in Ecuador. The losses incurred by the Investor Plaintiffs

total at least $752,252.29, excluding interest, fees or costs of collection. Additionally,

attorneys' fees and costs of collection are estimated to exceed $100,000.

**B.     The Debtor and Her Undisclosed Businesses and Assets**

16.     The Debtor is an individual who, until recently resided in Ecuador. The

Debtor relocated to Florida to avoid facing criminal and civil actions against her and her

property in Ecuador, which included attempts by the Investor Plaintiffs any many other defrauded investors to seek recourse against her.   There are currently pending in Ecuador at least 13 criminal complaints filed on behalf of numerous victims, including crimes such as: fraud, illegal collection of money, abuse of trust, and unjust enrichment.

17.    Although her Petition and the accompanying schedules list meager assets and no business interests, the Debtor is an Ecuadorian citizen who has maintained residences and businesses in Ecuador and elsewhere and has, until recently, owned, operated and/or controlled a vast array of business enterprises that have inexplicably vanished or been transferred to and maintained in the name of insiders, such as her daughters, and others.

18.    As such, the Debtor has engaged in a pattern of fraud and deceit that should compel a denial of her discharge, or, alternatively, that her debt to Plaintiffs be deemed nondischargeable.

For example, upon information and belief:

(i)     The Debtor is or has been a broker-dealer and investment advisor in Ecuador for years prior to her Petition filing;

(ii)    The Debtor, although working as a broker-dealer in Ecuador, was not legally registered to collect and maintain funds from clients in Ecuador;

(iii)   The Debtor is or has until last year been an investment advisor for Pro Advisors LLC, a Cayman Islands registered investment advisor, one of the vehicles through which she marketed the worthless Biscayne Notes (defined below);

(iv)    The Debtor is or was until recently an owner of hotels and other real estate

properties in Ecuador, including, but not limited to, Hotel Medina del Lago (also known as Hotel Casa Medina) located in San Pablo, Ecuador, to which hotel she and her husband Walter Medina invited guests for an inaugural celebration in April of 2016;

(v)    The Debtor has owned in her name and transferred to relatives at least three pieces of real property in Quito, Ecuador in the last few years;

(vi)    The Debtor has until recently had a thriving business processing, exchanging and/or "laundering" money for her clients between Ecuador and the United States for a fee. The Debtor has processed no less than hundreds of thousands of dollars in 2017 alone; and

(vii)    The Debtor is or was until recently a shareholder of Biscayne Capital Holdings, holding 91,500 shares as of 2016.

19.    Upon information and belief, the Debtor has knowingly made false statements, concealed property and engaged in other knowingly false, deceptive and fraudulent behavior in connection with the filing of her Petition, for which she is subject to fine and imprisonment for up to 20 years, pursuant to 18 U.S.C. §§ 152, 1341, 1519 and 3571. Such knowingly false statements include:

(i)    stating at Part 1 item 4 of her Petition that she has not used any business name in the past 8 years;

(ii)    stating at Part 6 item 16(a) of her Petition that her debts are primarily consumer debts as defined under Section 101(8) of the Bankruptcy Code;

(iii)    stating at item 17 of her Petition that she will have no non-exempt funds after payment of administrative expenses to distribute to unsecured creditors;

(iv)    stating at item 19 of her Petition that her assets are worth no more than $50,000;

(v)    stating at item 20 of her Petition that her liabilities total no more than $50,000, when she has known that Plaintiffs and others have been pursuing claims against her in the tens of millions of dollars;

(vi)    failing to list in Part 1 of her Statement of Financial Affairs ("**SOFA**") her non-U.S. residences in the past three years;

(vii)    under-reporting her current monthly income and assets in her SOFA and/or placing her assets and income in the names of relatives and other parties in an attempt to conceal her property and to place her assets beyond the reach of creditors;

(viii)    stating in Part 5 of her SOFA that she (a) has made no gifts with a total value of more than $600 to any person within 2 years of filing her Petition, and (b) has not preferred any creditor and has not transferred any property outside the ordinary course of business within 2 years of filing her petition; and

(ix)    stating in Part 9 of her SOFA that she does not hold or control any property that is owned by someone else.

20.    In addition, at her 341 Meeting, the Debtor acknowledged having had over $1,000,000 in an Ecuadorian bank account at Banco Pichincha, account number 280417104 as of 2016, and having owned and sold two valuable automobiles. She did not indicate what she did with the proceeds of these assets other than to state she used the money for her living expenses.

21.    The Debtor also acknowledged at her 341 Meeting that she failed to disclose her interest in a Florida limited liability company, Medina De Largo LLC, as well as a bank

account she shares with her husband, Walter Medina, at Bank of America. Thus, the Debtor has failed to satisfactorily explain how she disposed of the significant assets she acknowledges she has held, and she acknowledged that she failed to disclose certain assets in her Petition and SOFA filings.

22.    These actions and omissions render Debtor ineligible for discharge pursuant to 11 U.S.C. §§ 727 and render Defendant's debt to Plaintiffs nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (4) and (6).

**C.    The Debtor's Intentional Fraudulent and Misleading Actions in Connection with Marketing of Securities of the Biscayne Entities to the Investor Plaintiffs and in Disparaging Insight**

23.    The Debtor was a pivotal player in the marketing and sale of fraudulent securities of the Biscayne Entities, defined below, that form the basis of ongoing criminal investigations and many civil actions concerning a $500 million fraud/money laundering scam and Ponzi scheme in which, among other things, securities were sold through private placements, to unsuspecting investors in the United States and Latin America, and "interest" on those securities was paid by selling new issues of securities.

24.    Known criminal proceedings against principals and affiliates of the Biscayne Entities are pending in the Eastern District of New York and the Southern District of Florida. (See, e.g., *U.S. v. Gustavo Trujillo*, Case. No. 19-CR-00134-CBA, conviction, awaiting sentence, in the Eastern District of New York, and *U.S. v. Frank Roberto Chapman Ripalda*, Case No. 18-CR-20312, pending in the Southern District of Florida).

25.    The Biscayne Entities are also the subject of multinational bankruptcy proceedings pending in the Cayman Islands, Bermuda, the Bahamas and the British Virgin Island, and are Chapter 15 debtors in bankruptcy proceedings pending in the United States

Bankruptcy Court for the Southern District of Florida, procedurally consolidated under Case No. 18-24659(AJC). Another Biscayne Entity is a Chapter 15 debtor in bankruptcy proceedings pending the Unites States Bankruptcy Court for the Southern District of New York, Case No. 18-12814(MEW).

26.     In addition to the above-referenced criminal proceedings, pursuant to an Enforcement Order of the United States Securities and Exchange Commission, dated May 27, 2016, a copy of which is attached hereto as **Exhibit C** (the "**SEC Order**") a number of individuals who controlled the Biscayne Entities were sanctioned and barred from the securities industry for numerous violations of securities and investment advisor laws, conflicts of interests, and knowing failure to disclose material information in connection with the sale of the Biscayne Notes (defined below) that are the subject of the Plaintiffs' claims.

27.     According to the SEC Order, in or before 2008, certain individuals, Frank Chatburn, Ernesto H. Weisson Pazmin, Roberto Cortes Ripalda, and Juan Carlos Cortes (collectively the "**Biscayne Individuals**") formed several entities, including Biscayne Capital International, LLC ("BCI"), Sentinel Mandate & Escrow, Ltd. ("Sentinel") and South Bay (BCI, Sentinel, South Bay and their affiliated entities are collectively referred to herein as the "**Biscayne Entities**"), ostensibly to develop real estate projects in Florida (the "**Florida Developments**") and to finance those developments. In 2008 and thereafter, the Biscayne Individuals formed various mutual fund entities to raise capital from foreign investors and to then lend the capital raised to South Bay and other Biscayne Entities through a series of unsecured promissory notes.

28.     In January of 2008, the Debtor resigned from her job as a broker for Bear

Stearns & Co. Inc. in Quito, Ecuador, joined the Biscayne Entities' sales and marketing team and thereupon began promoting the Biscayne Entities' financial products to her Ecuadorian customers.

29.     Thereafter, the Debtor regularly and closely interacted with the Biscayne Individuals, including, *inter alia*:

(i)     Monthly visits by various Biscayne Individuals to the Debtor's office in Ecuador;

(ii)    Having various Biscayne Individuals solicit her clients to invest in the various South Bay-related promissory notes;

(iii)   Travelling to BCI's offices in Miami every three to four months to meet with the Biscayne Individuals;

(iv)    In April 2010, the Debtor traveled to Montevideo, Uruguay with her four salespersons for several days of meetings at BCI's Uruguay office;

(v)     In March and May 2011, the Debtor attended meetings in BCI's Miami office regarding Sentinel and the South Bay financial products;

(vi)    In December 2011, the Defendant traveled to Montevideo, Uruguay to meet with Biscayne Individuals;

(vii)   In February 2012, the Defendant again travelled to BCI's Miami office to meet and strategize with the Biscayne Individuals;

(viii)  In October 2012, the Defendant against spent several days in Miami with the Biscayne Individuals; and

(ix)    The Defendant also attended the BCI annual meetings in 2012, 2013, 2014, and 2015.

30.     Starting in 2010, to further their Ponzi scheme, the Biscayne Individuals formed four additional mutual funds and/or issuers of Biscayne Notes:

(i)     SG Strategic Income, Ltd., which issued more than $75 million in promissory notes which were offered to foreign investors for investment at a variable targeted distribution of 3.875% per annum and a maturation date of May 31, 2018. This issuer was to invest the capital raised through the promissory notes to finance the construction of the Florida Developments;

(ii)    GMS Global Step Up Note, Ltd., which issued more than $85 million in promissory notes, which were offered to foreign investors for investment at a variable targeted distribution of 5%-7.5% per annum. This issuer was to invest the capital raised through the promissory notes to finance the construction of the Florida Developments;

(iii)   Diversified Real Estate Development, Ltd., formerly known as ORC Senior Secured Limited, issued approximately $54 million in promissory notes, which were offered to foreign investors for investment at a fixed distribution of 7% per annum. This issuer was to invest the capital raised through the promissory notes to finance the construction of the Florida Developments; and

(iv)    Preferred Income Collateralized Interest, Ltd. issued approximately $30 million in promissory notes, which were offered to foreign investors for investment at a variable targeted distribution of 6.25%-7.75% per annum. This issuer was to invest the capital raised through the promissory notes to finance the construction of the Florida Developments.

31.     In or about 2016, the Biscayne Individuals, in need of "fresh" funds to fuel

their Ponzi scheme, organized yet another Biscayne Entity to issue a new round of Biscayne Notes: IA Capital Structures (Ireland) PLC ("**IACAP**") which issued approximately $50 million in promissory notes, which were offered to foreign investors for investment at an interest rate of 7.5 % per annum.

32.    The Debtor, aware that the Biscayne Notes were illiquid and were not financially viable, nonetheless caused her clients to invest in these additional Biscayne Notes referenced in the preceding paragraphs, between 2012-2016.

33.    Moreover, upon information and belief, the Debtor was aware that the Biscayne Notes proceeds were not being used to fund the Florida Developments debt balances, to repurchase earlier issued Biscayne Notes sold to customers who were threatening to go to the authorities, to meet the interest payments of earlier issued Biscayne Notes already held by the Debtor's clients, and to pay the Debtor's commissions.

34.    Despite this knowledge, the Debtor and her team (which included her daughters) solicited her Ecuadorian clients, including the Investor Plaintiffs, to liquidate their investments in GMS and Diversified Real Estate and, instead of advising them to hold onto those funds or invest them in lower risk securities (which would have forced the Ponzi scheme to collapse sooner), solicited them to use the proceeds to purchase IACAP notes.

35.    As part of her solicitation of purchases of the Biscayne Notes, Debtor made knowingly false statements to the Investor Plaintiffs:  that the IACAP notes and other Biscayne Notes were backed by the Federal Reserve or had been issued by Deutsche Bank or that the Biscayne Notes were insured.

36.    The Debtor, who had been previously associated with the National Association of Securities Dealers, knew the applicable rules, regulations, and laws related

to the offer and sale of securities, and knew that she was intentionally violating these rules, regulations, and statutes.

37.     Moreover, from her involvement with the Biscayne Individuals and the solicitations she made involving the Biscayne Notes, the Debtor knew that Insight had no involvement whatsoever with the Biscayne Individuals, the Biscayne Entities, the fraudulent Biscayne Notes, or in any solicitation or order to purchase or sell those securities.

38.     The Debtor knew that the Individual Investors' accounts were opened at Insight and maintained by her on behalf of her clients, including the Investor Plaintiffs.

39.     Thus, the Debtor used knowingly false information to disparage Insight and to cause certain investors to file claims against Insight, which are now pending before FINRA. Moreover, as a direct and proximate result of the Debtor's knowingly false and disparaging statements, Insight's clearing firm, Pershing, LLC cancelled its clearing agreement with Insight.

### COUNT I -- NON-DISCHARGEABILITY OF PLAINTIFFS' CLAIMS UNDER SECTION 523(a)(2)(A) OF THE BANKRUPTCY CODE

40.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 39 of this Complaint as if set forth at length herein.

41.     Bankruptcy Code § 523(a)(2) (A) provides, in relevant part, that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or
> 1328(b) of this title does not discharge an individual debtor
> from any debt--
> (2) for money, property, services, or an extension, renewal,
> or refinancing of credit, to the extent obtained by --
> (A) false pretenses, a false representation or actual fraud,
> other than a statement respecting the debtor's or an insider's
> financial condition . . . .

42.     All or part of the debt owed to Plaintiffs is non-dischargeable as it is (i) a debt for reimbursement of money invested by the Investor Plaintiffs that was obtained by false pretenses, a false representation, or actual fraud; (ii) a debt for contribution to Insight by virtue of false and/or fraudulent representations made to Insight clients (a) to cause them to invest in worthless securities, and (b) to cause damage to the business of Insight within the meaning of Bankruptcy Code §§ 523(a)(2)(A).

WHEREFORE, the Plaintiffs respectfully request that this Court except the indebtedness owed to each of the Plaintiffs from the discharge, and for such other and further relief as is just under the circumstances.

### COUNT II -- NON-DISCHARGEABILITY OF PLAINTIFFS' CLAIMS UNDER SECTION 523(a)(4) OF THE BANKRUPTCY CODE

43.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 42 of this Complaint as if set forth at length herein.

44.     Bankruptcy Code § 523(a)(4) provides, in relevant part, that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt— . . .
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

45.     All or part of the debt owed to Plaintiffs is non-dischargeable as it is a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning of Bankruptcy Code §523(a)(4).

WHEREFORE, the Plaintiffs respectfully request that this Court except the indebtedness owed to each of the Plaintiffs from the discharge, and for such other and further relief as is just under the circumstances.

## COUNT III -- NON-DISCHARGEABILITY OF PLAINTIFFS' CLAIMS
## UNDER SECTION 523(a)(6) OF THE BANKRUPTCY CODE

46.　　　Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 45 of this Complaint as if set forth at length herein.

47.　　　Bankruptcy Code § 523(a)(6) provides, in relevant part, that:

> (b) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt...
> (6) For willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

48.　　　All or part of the debt owed to Plaintiffs is non-dischargeable as it is a debt for willful and malicious injury caused by the Debtor within the meaning of Bankruptcy Code § 523(a)(6).

WHEREFORE, the Plaintiffs respectfully request that this Court except the indebtedness owed to each of the Plaintiffs from the discharge, and for such other and further relief as is just under the circumstances.

## COUNT IV -- OBJECTION TO DEBTOR'S DISCHARGE UNDER
## SECTION 727(a)(3) OF THE BANKRUPTCY CODE

49.　　　Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 48 of this Complaint as if set forth at length herein.

50.　　　Bankruptcy Code § § 727(a)(3) provides, in relevant part, that:

> (a) The court shall grant the debtor a discharge, unless
> . . .
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
> (A) property of the debtor, within one year before the date of the filing of the petition; or.....
> (3) the debtor has concealed, destroyed, mutilated, falsified,

> or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case....

51.     By virtue of her actions in concealing or fraudulently transferring her assets and failing to maintain records from which her use of her funds can be ascertained, the Debtor's discharge should be denied under Bankruptcy Code § 727(a)(3).

WHEREFORE, the Plaintiffs respectfully request that this Court deny the Debtor's discharge, and for such other and further relief as is just under the circumstances.

### COUNT V -- OBJECTION TO DEBTOR'S DISCHARGE UNDER SECTION 727(a)(4)(A) and (B) OF THE BANKRUPTCY CODE

52.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 52 of this Complaint as if set forth at length herein.

53.     Bankruptcy Code § 727(a)(4) provides, in relevant part, that:

> (a) The court shall grant the debtor a discharge, unless ---
> (4) the debtor knowingly and fraudulently, in or in connection with the case --
> (A) made a false oath or account; or
> (B) presented or used a false claim.

54.     The Debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account, in that she misrepresented her assets, income and transfers in the schedules to her Petition and at her 341 Meeting.

55.     By virtue of the Debtor's false representations and omissions, and the oath she took concerning the veracity of her submissions, the Debtor's discharge should be denied under Bankruptcy Code § 727(a)(4)(A) and (B).

WHEREFORE, the Plaintiffs respectfully request that this Court deny the Debtor's discharge, and for such other and further relief as is just under the circumstances.

### COUNT VI -- OBJECTION TO DEBTOR'S DISCHARGE UNDER SECTION 727(a)(5) OF THE BANKRUPTCY CODE

56.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 56 of this Complaint as if set forth at length herein.

57.     Bankruptcy Code § 727(a)(5)(A) provides that:

> (a) The court shall grant the debtor a discharge, unless ---
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

58.     Other than stating at her 341 Meeting that she liquidated and used her substantial assets to pay for her living expenses, the Debtor has failed to satisfactorily explain, by documents or otherwise, how she dissipated her significant assets prior to filing her Petition.

59.     By virtue of the foregoing, the Debtor's discharge should be denied under Bankruptcy Code § 727(a)(5).

WHEREFORE, the Plaintiffs respectfully request that this Court deny the Debtor's discharge, and for such other and further relief as is just under the circumstances.

### COUNT VII -- OBJECTION TO DEBTOR'S DISCHARGE UNDER SECTION 727(a)(7) OF THE BANKRUPTCY CODE

60.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 59 of this Complaint as if set forth at length herein.

61.     Bankruptcy Code § 727(a)(7) provides that:

(a) The court shall grant the debtor a discharge, unless ---
(7) the debtor has committed any act specified in this title
...concerning an insider.

62.     Upon information and belief, the Debtor has made material transfers directly and indirectly to insiders within one year of filing the Petition, including her daughters that are preferential and or fraudulent transfers and have the effect of hindering, delaying and defrauding her creditors.

63.     By virtue of the foregoing, the Debtor's discharge should be denied under Bankruptcy Code § 727(a)(7).

WHEREFORE, the Plaintiffs respectfully request that this Court deny the Debtor's discharge, and for such other and further relief as is just under the circumstances.

Dated September 23, 2019.

/s/ Bradley M. Saxton
Bradley M. Saxton, Esquire
Florida Bar No.: 0855995
bsaxton@whww.com
**WINDERWEEDLE, HAINES, WARD**
**& WOODMAN, P.A.**
PO Box 880
Winter Park, Florida 32790-0880
Telephone: (407) 423-4246
Fax: (407) 645-3728

and

Karen Ostad, Esquire
OSTAD PLLC
kostad@ostadllc.com
917-443-1558
60 Cuttermill Road, Suite 610
Great Neck, NY 11021
*Attorneys for Plaintiffs*

## BEFORE THE UNITED STATES CEISTRIT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

INSIGHT SECURITIES, INC., an Illinois )
corporation,                          )
                                      )
      **Plaintiff**                     )
                                      )      **Case No.**
      **v.**                           )
                                      )
EDITH ALEXANDRA HINOJOSA              )
CORDOVA,                              )
                                      )
      **Defendant.**                    )

## COMPLAINT

Plaintiff Insight Securities, Inc. ("Insight"), by and through its undersigned attorneys, and, for its Complaint against Defendant Edith Alexandra. Hinojosa Cordova ("Hinojosa"), states as follows:

1.    This is an action seeking both actual damages and declaratory relief pursuant to 28 U.S.C. § 2201 to declare the rights and obligations of the parties hereto.

2.    Plaintiff is an Illinois corporation with its principle place of business in Highland Park, Illinois

3.    The Defendant is a citizen and resident of Ecuador.

4.    The amount in controversy exceeds $75,000 exclusive of interest and costs.

5.    Jurisdiction is conferred upon this court pursuant to 28 U.S.C. §1332.



6.    To avoid the consequences of her own actions, the Defendant has caused Plaintiff to be served with various legal actions, one of which is currently pending in Cook County, Illinois.  Hinojosa's actions as herein described, have caused Insight to lose certain business relationships necessary to the operation of its Highland Park, Illinois office that have had, and will continue to have, serious adverse effect on Insight's current income and its future income and growth. Therefore, venue is properly before the United states district court for the Northern District of Illinois, Eastern Division.

## FACTUAL BACKGROUND

7.    Insight is an Illinois Corporation registered as a securities broker/dealer with the Financial Industry Regulatory Authority ("FINRA") with its principle place of business located in Highland Park Illinois.

8.    The Defendant, as more fully described below, is a former registered broker who operates in Ecuador as a financial/investment advisor. In that capacity she has caused her Ecuadorian clients to enter orders in the United States for their various securities accounts carried by a registered U.S. broker/dealer.

9.    Defendant has travelled frequently to the United States to promoter her business. Defendant also solicited clients while in the United States and using both the telephone and the internet, to place orders with domestic U.S. brokerage firms for the purchase and sale of securities. Specifically relating to Insight, Defendant caused at least sixty (60) of her customers in Ecuador to open securities accounts with

Plaintiff in Highland Park, Illinois and facilitated the completion and transmission of account opening documentation to Insight's offices in the United States.

10.    Thereafter, the Defendant, for a period of at least two years, caused orders for the purchase or sell of securities to be transmitted on behalf of these customers to Insight's office in Highland Park, Illinois.

11.    In an attempt to conceal her own tortious conduct, the Defendant published, and caused to be published, in Illinois and elsewhere, false and defamatory statements concerning Plaintiff, the result of which has caused Plaintiff to incur monetary damages in Highland Park, Illinois.

12.    Beginning in 2016, the Defendant became an agent for Pro Advisors and, in that capacity, repeatedly caused Pro Advisors to transmit to Insight's Highland Park, Illinois office orders for the purchase and sale of securities on behalf of her Ecuadorian clients.

13.    Beginning in 2016, Insight began opening accounts for Defendant's Ecuadorian customers. Thereafter, Insight began executing orders for those clients all of whom, at the Defendant's insistence, had provided a written power of attorney to Insight specifying Pro Advisors LLC, a Cayman Island registered investment advisor with its principle place of business in the Cayman Islands ("Pro Advisors"), as having authority to enter transactions on their behalf.

14.    Insight never solicited any transaction from any of the Defendant's clients but merely executed the orders received from Pro Advisors. Plaintiff collected

the fees owed to Pro Advisors, which amounted to ninety-percent (90%) of the fees charged for executing the orders and remitted those sums to Pro Advisors.

15.    The Defendant, an investment advisor, who was operating in Ecuador, apparently became fearful over the actions or threatened actions by her investment clients who have lost over $30 million dollars as a result of her actions and has fled to the State of Florida where she now resides.

## THE RELEVANT SECURITIES

16.    At some time before 2007, Frank Chatburn ("Chatburn"), Ernesto H. Weisson Pazmin ("Wesson"), Roberto Cortes Ripalda ("R. Cortes"), and Juan Carlos Cortes ("J.C. Cortes") (collectively "the Biscayne individuals") organized Biscayne Capital International, LLC. ("BCI") and Sentinel Mandate & Escrow, Ltd. ("Sentinel").

17.    The Biscayne Individuals devised a series of real estate projects located in Florida that were in financial distress (the "Florida Developments") with plans to develop approximately 29 lots in Key Biscayne and Monroe County into luxury residential homes and recreational communities. Specifically, the Florida Developments included:

    a.  A housing development of single-family homes located in Key Largo owned and operated by Cinnamon Cay with properties at: 32 Cinnamon Bark Lane, Key Largo, Florida 33037; 40 Cinnamon Bark Lane, Key Largo, Florida 33037; 42 Cinnamon Bark Lane, Key Largo, Florida 33037; 44 Cinnamon Bark Lane, Key Largo, Florida 33037.

    b.  A housing development of single-family homes located in Key Largo owned and operated by Cinnamon Cay II with properties at: 3 Mahogany Lane, Key Largo, Florida 33037; 4 Mahogany Lane, Key

4

Largo, Florida 33037; 35 Baker Road, Key Largo, Florida 33037; 36 Baker Road, Key Largo, Florida 33037; 355 South Harbor Largo, Florida 33037; 365 South Harbor Largo, Florida 33037.

c.  A housing development of single-family homes located in Key Largo owned and operated by Cinnamon Prime with properties at: 46 Cinnamon Bark Lane Largo, Florida 33037; 47 Cinnamon Bark Lane Largo, Florida 33037; 49 Cinnamon Bark Lane Largo, Florida 33037.

d.  54 condominium units with 2-4 bedrooms owned by 7940 West Dr with properties at: 7940 West Drive North Bay Village, Florida 33141; North Bay Village Land.

18.    Through an entity known as South Bay, a Florida limited liability company, the Biscayne individuals controlled all of the properties comprising the Florida Development.

19.    In 2008, to raise the capital needed by South Bay, the Biscayne Individuals formed various independent mutual funds that would raise capital from foreign investors and then lend the capital raised to South Bay through a series of unsecured promissory notes.

20.    The Defendant decided to resign from Bear Stearns & Co. Inc. and to join BCI in January 2008 and immediately began promoting South Bay related financial products to her Ecuadorian customers.

21.    Thereafter, the Defendant closely interacted with the Biscayne Individuals, including *inter alia*:

a.  Monthly visits by various of the Biscayne individuals to the Defendant's office in Ecuador;

b.  Having various of the Biscayne individuals solicit her clients to invest in the various South Bay-related promissory notes;

   c. Travelled to BCI's offices in Miami every three to four months to meet with the Biscayne individuals;

   d. In April 2010 the Defendant Hinojosa traveled to Montevideo, Uruguay with her four salespersons for several days of meetings at Biscayne Uruguay's office;

   e. In March and May 2011, the Defendant attended meetings in BCI's Miami office regarding Sentinel and the South Bay Financial Products;

   f. In December 2011, the Defendant traveled to Montevideo, Uruguay to meet with BCI individuals;

   g. In February 2012, the Defendant again travelled to BCI's Miami office to meet and strategize with the BCI individuals;

   h. In October 2012, the Defendant against spent several days in Miami with the BCI individuals; and

   i. The Defendant also attended the BCI annual meetings in 2012, 2013, 2014, and 2015.

From her close association with the Biscayne individuals, Hinojosa knew that Insight had not involvement in the creation of the notes listed below or in soliciting their purchase.

   22.    Starting in 2010, the Biscayne Individuals formed four additional mutual funds and/or issuers of promissory notes ("the Biscayne notes"):

   a. SG Strategic Income, Ltd. ("SG") which issued more than $75 million in promissory notes which were offered to foreign investors for investment at a variable targeted distribution of 3.875% per annum and a maturation date of May 31, 2018. SG was to invest the capital raised through the promissory notes to finance the construction of the Florida Developments.

   b. GMS Global Step Up Note, Ltd. ("GMS") which issued more than $85 million in promissory notes, which were offered to foreign investors for investment at a variable targeted distribution of 5%-7.5% per

annum. GMS was to invest the capital raised through the promissory notes to finance the construction of the Florida Developments.

c. Diversified Real Estate Development, Ltd. ("Diversified Real Estate") formerly known as ORC Senior Secured Limited, issued approximately $54 million in promissory notes, which were offered to foreign investors for investment at a fixed distribution of 7% per annum. Diversified Real Estate was to invest the capital raised through the promissory notes to finance the construction of the Florida Developments.

d. Preferred Income Collateralized Interest, Ltd. ("PICI") issued approximately $30 million in promissory notes, which were offered to foreign investors for investment at a variable targeted distribution of 6.25%-7.75% per annum. PICI was to invest the capital raised through the promissory notes to finance the construction of the Florida Developments.

The Defendant caused her clients to invest in these products between 2012-2016.

23.   In or about 2016, the Biscayne individuals organized IA Capital Structures (Ireland) PLC ("IACAP") which issued approximately $50 million in promissory notes, which were offered to foreign investors for investment at an interest rate of 7.5 % per annum.

24.   On information and belief, at the time, the Defendant knew that the undisclosed purpose of IACAP was to invest the capital raised through the promissory notes to finance the brokerage accounts of Biscayne Uruguay, *i.e.* to enable those investors to liquidate some or all of their holdings in the previous notes.

25.   Despite this knowledge, the Defendant and her team (which included several of her daughters) solicited her Ecuadorian clients to sell their investments in GMS and Diversified Real Estate (ORC) and, rather than advising them to hold those

funds or investing them in lower risk securities, she solicited them to use the proceeds to purchase IACAP.

26.    On information and belief, in making the solicitations, Hinjosa misrepresented that the Biscayne Notes and IACAP were backed by the Federal Reserve or had been issued by Deutsche Bank or that the notes were insured.

27.    Beginning in the Summer of 2017, the aforementioned Biscayne Notes and IACAP notes began defaulting on their interest payment and by the end of September 2018 all of these notes were in default.

28.    In or about September 2017, Hinojosa and her daughters absconded, leaving Ecuador for parts unknown. Hinjosa's office was shuttered, her employees gone, and her clients were unable to reach her.

29.    When Hinojosa emerged from hiding, she began contacting her clients from her new residence in Miami, Florida.  To divert the blame for her customer losses, Hinojosa began to disparage and defame Insight stating that, the Biscayne and IACAP notes were part of a Ponzi scheme and that Insight was involved in that scheme. At the time that Hinojosa made these statements she did so knowing that the statements were false.

30.    These statements were published in both Ecuador and the United States.

31.    Hinojosa then began soliciting her former customers to retain Akerman LLP, a Miami Florida, law firm, to institute an arbitration before the Financial Industry Regulatory Authority ("FINRA") against FINRA by repeating her false and

disparaging statements about Insight, provided that the former clients agreed not to sue Hinojosa. *See* Exhibit "A" hereto.

32.    As a direct and proximate result of Hinojosa's false and disparaging statements, Insight's clearing firm, Pershing, LLC cancelled its clearing agreement with Insight.

33.    Hinojosa's malicious and tortuous utterances have damaged Insight's goodwill in an amount in excess of $1 million.

**COUNT I**

**DECLARATORY RELIEF**

34.    Insight realleges ¶ 5 through ¶ 34 as ¶ 35 of this, Count I, though fully set forth herein.

35.    Moreover, ninety-eight of Hinojosa's clients have filed a FINRA arbitration against Insight styled <u>Ada Serena Cordova Armijos, et al, v. Raymond James & Associates, Inc. and Insight Securities, Inc.</u>, FINRA Arb. No. 18-02934 seeking $30 million in damages and three additional clients of Hinojosa's have filed another arbitration against Insight styled <u>George Maalouf Georges, et al v. Insight Securities, Inc.</u>, FINRA Arb. No. 18-02176 seeking in excess of $1.5 million in damages.

36.    The Claimants in both arbitrations had granted power of attorney to Pro Advisors authorizing Pro Advisors to enter transactions in their accounts. All of the transactions for which the Claimants in both the aforementioned arbitrations are

seeking recovery were solicited by Hinojosa who then transmitted the instruction to Pro who then placed the orders with Insight.

37.    At all times relevant to both of the aforementioned arbitrations, Insight merely provided execution and custodial services to the Claimants and never solicited a single transaction.

WHEREFORE, pursuant to 28 U.S.C. § 2201, Insight seeks a declaration that, if an award is entered against Insight in either or both of the aforementioned FINRA arbitrations, that Insight is entitled to contribution of the full amount of such awards from Hinojosa pursuant to 740 ILCS 100/2.

## II.

## DEFAMATION

38.    Insight realleges ¶ 7 through ¶ 37, above, as ¶ 38 of this, Count II, as though fully set forth herein.

39.    As herein previously alleged, beginning in November 2016 and continuing until the present, Hinojosa knowingly, willfully, and malicious made the following false statements:

j.  That Insight was involved in a Ponzi scheme to sell both the Biscayne and IACAP notes to person located throughout South America and particularly in Ecuador;

k.  The Insight was grossly negligent in the operation of its business and that this gross negligence caused her clients to lose money, in some instances, their life savings.

40.    Hinojosa published these false and defamatory statements to well over one hundred persons.

41.    Such statements constitute defamation *per se.*

42.    As a result of these knowingly false statements published by Hinojosa, insight has incurred loss of business and damage to its goodwill totaling in excess of $1 million.

WHEREFORE, Insight prays that judgment be entered against Hinojosa in the amount of at least $1 million in compensatory damages, $3 million in punitive damages, and costs.

## III.

## VILOLATION OF THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT

43.    Insight realleges ¶ 7 through ¶ 37 and ¶39 thru ¶ 42 as ¶ 43 of this, Count III, as though fully set forth herein.

44.    The statements made by Hinojosa as herein previously alleged were made during the course of her business or profession, *i.e.* a financial consultant, and disparaged the services and business of Insight in violation of 815 ILCS 510/2(8) and constitutes a violation of 815 ILCS 505/2.

45.    Insight has suffered actual damages as a result of Hinojosa's violation of 815 ILCS 510/2(8) and 815 ILCS 505/2.

WHEREFORE, pursuant to 815 ILCS 505/10a that judgment be entered against Hinojosa in the sum of at least $1 million in compensatory damages, at least $3 million in punitive damages and for costs, including attorney's fees.

11

## IV.

## COMMERCIAL DISPARAGEMENT

46.    Insight realleges ¶ 7 through ¶ 37 and ¶39 thru ¶ 42 as ¶ 46 of this, Count IV, as though fully set forth herein.

47.    The previously alleged false statements made by Hinojosa concerned the conduct of Insight's business and were made to influence persons not to avail themselves of Insight's services.

48.    As a result of these statements, Insight has incurred damages of at least $1 million.

49.    Hinojosa's actions as herein alleged were willful and wanton.

WHEREFORE, Insight prays that judgment be entered against Hinojosa in the amount of at least $1 million in compensatory damages, $3 million in punitive damages, and costs.

Respectfully Submitted

One of Plaintiffs' attorneys

Nicholas P. Iavarone, Esq.
The Iavarone Firm, P.C.
33 North LaSalle, Suite 1400
Chicago, IL 60602
(312) 63 7-9466
(800) 417-0580 (fax)

Laurence M. Landsman, Esq.
The Landsman Law Firm
33 North LaSalle, Suite 1400
Chicago, IL  60602
(312) 251-1144
312) 251-1147 (fax)

| No. | Investor Plaintiff Name | Account | Firm | Face Value of | Address |
|---|---|---|---|---|---|
| 1 | Integra Limited | QGU - 055057 | Insight | 10,335.00 | 201 Alhambra Circle, Ste 600, Coral Gables FL33134 |
| 2 | Golden Riva | QGU - 045918 | Insight | 20,000.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 3 | Vincenzo Caccio | QGU - 045694 | Insight | 71,712.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 4 | José Fernández | QGU - 045611 | Insight | 46,106.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 5 | Fanny Maldonado | QGU - 041610 | Insight | 17,557.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 6 | Luis Fernando Guzman | QGU - 034441 | Insight | 30,815.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 7 | Carmen Vivanco | QGU - 034433 | Insight | 22,582.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 8 | Oscar Erraez | QGU - 032031 | Insight | 8,000.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 9 | Marco Rivadeneira | QGU - 030472 | Insight | 12,375.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 10 | Luis Enriquez | QGU - 029441 | Insight | 61,890.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 11 | Luis Dávila | QGU - 028286 | Insight | 40,000.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 12 | Verónica Hinojosa | QGU - 027817 | Insight | 20,350.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 13 | José De La Torre | QGU - 034425 | Insight | 30,897.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 14 | Luz Pazmiño | UBS | UBS | 80,000.00 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 15 | Roberto Javier Vernaza | DP. 5478452 | ProAdvisor | 26,773.57 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 16 | Samuel Sánchez | DP. 3229651 | ProAdvisor | 41,753.49 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 17 | Stalin Villafuerte | DP. 3236296 | ProAdvisor | 94,861.43 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 18 | María Riofrío | DP. 3528130 | ProAdvisor | 31,288.49 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 19 | María Calero | DP. 3222175 | ProAdvisor | 63,927.43 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 20 | José de la Torre | DP. 3226109 | ProAdvisor | 7,900.69 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |
| 21 | Fanny Maldonado | DP. 3258476 | ProAdvisor | 13,128.19 | c/o Francisco Estupinan Toledo, Aurelio Davila y Rio San Pedro, Urbanizacion Agaves 23, Quito Ecuador |

TOTAL (USD)  752,252.29  Plus attorneys' fees and costs of collection estimated in excess of $100,000



EXHIBIT
B
tabbies™

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 4399 / May 27, 2016

INVESTMENT COMPANY ACT OF 1940
Release No. 32130 / May 27, 2016

ADMINISTRATIVE PROCEEDING
File No. 3-17263

| | |
|---|---|
| In the Matter of<br><br>  BISCAYNE CAPITAL<br>  INTERNATIONAL, LLC,<br>  ROBERTO G. CORTES,<br>  ERNESTO H. WEISSON,<br>  JUAN CARLOS CORTES, and<br>  FRANK R. CHATBURN<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Biscayne Capital International, LLC, Roberto G. Cortes, Ernesto H. Weisson, Juan Carlos Cortes, and Frank R. Chatburn ("Respondents").

II.

In anticipation of the institution of these proceedings, each Respondent has submitted an Offer of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.



EXHIBIT

_C_

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1.        These proceedings arise out of the failure of Biscayne Capital International, LLC ("BCI"), formerly a U.S. registered investment adviser, to disclose facts giving rise to multiple conflicts of interest and other material information under the Investment Advisers Act of 1940 (the "Advisers Act") in connection with the recommendation and sale of securities issued by private offshore investment companies under common beneficial ownership with BCI (hereinafter "Proprietary Products") to non-U.S. clients between August 2010 and March 2012 (the "Relevant Period"). Three BCI principals – Roberto G. Cortes ("Roberto Cortes"), Ernesto H. Weisson ("Weisson") and Juan C. Cortes ("Juan Cortes") (collectively "the Primary BCI Principals"[2]) – formed entities that issued the Proprietary Products primarily for the purpose of financing South Bay Holdings, LLC ("South Bay"), a Florida-based residential real estate developer, which itself was beneficially owned by Roberto Cortes and Weisson. In turn, South Bay was the majority beneficial owner of BCI during the Relevant Period.

2.        BCI failed to disclose, among other things, the Primary BCI Principals' beneficial ownership interest and role in the creation of the Proprietary Products issuers. Further, BCI failed to disclose additional material information under the Advisers Act concerning South Bay's financial condition, including that, both preceding and during the Relevant Period, South Bay failed to generate enough revenue or operating cash flow to meet maturing debt, or sustain operations absent obtaining the additional financing generated by the sale of Proprietary Products, and was required to renegotiate several past-due financial obligations. By doing so, BCI willfully violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940.

3.        Roberto Cortes, Weisson, and Juan Cortes created BCI and several affiliated non-U.S. financial services entities, all operating under the Biscayne Capital name, and marketed the Proprietary Products through their financial advisors, five of whom, including Frank Chatburn, they knew were employed by both BCI and the affiliated non-U.S. financial services entities.

4.        Roberto Cortes, Weisson and Juan Cortes each willfully aided and abetted and caused BCI's violations of Section 206(2) of the Advisers Act by failing to prohibit the sales of the Proprietary Products through the U.S.-based BCI or, in the alternative, by failing to train BCI investment adviser representatives to make adequate disclosures under the Advisers Act concerning the conflicts of interest and South Bay's financial condition, when recommending Proprietary Products to BCI clients.[3]

---

[1] The findings herein are made pursuant to each Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] Other individuals, including Frank Chatburn, had a beneficial ownership interest in and were principals of BCI.

[3] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)).

5.      Frank Chatburn ("Chatburn"), who was both an investment adviser representative for BCI as well as an investment adviser for the non-U.S. financial services entities, willfully aided and abetted and caused BCI's violations of Section 206(1) and 206(2) of the Advisers Act by recommending and selling approximately $3.49 million in Proprietary Products to 29 non-U.S. BCI clients without making adequate disclosures under the Advisers Act.  He failed to conduct a "fundamental analysis" of the Proprietary Products in contravention of representations in BCI's Form ADV; and failed to conduct an investigation or inquiry into, *inter alia*, the ownership or operation of Proprietary Product issuers or into South Bay's financial condition notwithstanding red flags concerning these entities.  Chatburn also failed to disclose that he had a personal conflict of interest when recommending the Proprietary Products to BCI clients based on his beneficial ownership interest in BCI and the non-U.S. Biscayne Capital financial services entities as well as undisclosed compensation he received in connection with his recommendation and sale of the Proprietary Products to BCI clients.

6.      Additionally, BCI willfully failed, and Juan Cortes willfully aided and abetted and caused BCI's failure, to design and implement policies and procedures reasonably designed to prevent violations of the Advisers Act.  BCI also willfully made, and Roberto Cortes and Juan Cortes willfully aided and abetted and caused BCI to make, material misrepresentations in Form ADV.  Additionally, during the Relevant Period, BCI, Roberto Cortes, and Juan Cortes each failed reasonably to supervise Chatburn.

## Respondents

7.      **Biscayne Capital International, LLC ("BCI")**, formerly a Florida limited liability company headquartered in Miami, Florida, was an investment adviser registered with the Commission between October 14, 2008 and June 26, 2012.  BCI provided discretionary and non-discretionary advisory services primarily to Latin American individuals and entities.  BCI had approximately $12.8 million in assets under management ("AUM") as of December 31, 2011.

8.      **Roberto G. Cortes ("Roberto Cortes")**, age 49, of Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period as well as its Chief Executive Officer.  He also is a beneficial owner of, and directly or indirectly controls, South Bay Holdings, LLC, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities.

9.      **Ernesto H. Weisson ("Weisson")**, age 47, of Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period.  He also is a beneficial owner of, and directly or indirectly controls, South Bay Holdings, LLC, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities.

10.     **Juan Carlos Cortes ("Juan Cortes")**, age, 37, an Ecuadorian citizen and permanent resident of the United States residing in Miami, Florida, was a co-founder and beneficial owner of BCI during the Relevant Period as well as its Chief Operating Officer.  Juan Cortes also served as BCI's Chief Compliance Officer until late 2011.  Juan Cortes is a beneficial owner of, and directly or indirectly controls, the Proprietary Products issuers, and the affiliated non-U.S. financial services entities.  He also is Roberto Cortes' brother.

11.      **Frank R. Chatburn ("Chatburn")**, age 37, a dual United States and Ecuadorian citizen residing in Miami, Florida, was a beneficial owner of BCI as well as an investment adviser representative of BCI during the Relevant Period.  He also is a beneficial owner and financial adviser for the affiliated non-U.S. financial services entities.  Chatburn is Roberto Cortes' cousin.

## Other Relevant Individuals and Entities

12.      **South Bay Holdings, LLC ("South Bay")**, a Florida limited liability company headquartered in Miami, Florida, is a private real estate development company that concentrates on residential real estate in South Florida.  South Bay is beneficially owned by Roberto Cortes and Weisson.

13.      **Sentinel Investment Fund, Ltd. ("Sentinel")**, a Proprietary Products issuer, is, according to private placement memoranda, "an exempted limited liability company of unlimited duration registered as a Segregated Portfolio Company" in the Cayman Islands.  Sentinel was formed primarily for the purpose of financing the activities of South Bay through the sale of preferred shares to non-U.S. investors.  Roberto Cortes, Weisson, and Juan Cortes are directors and beneficial owners of Sentinel.

14.      **Spyglass Investment Management, Ltd. ("Spyglass")** is, according to the Sentinel private placement memoranda, "a company limited by shares" incorporated in the British Virgin Islands.  Spyglass served as the investment adviser to Sentinel and certain of the other Proprietary Products issuers during the Relevant Period.  Spyglass delegated all of its responsibilities to Roberto Cortes during the Relevant Period.  Roberto Cortes, Weisson and Juan Cortes beneficially own Spyglass.  Spyglass has never been registered with the Commission.

15.      **SG Strategic Income, Ltd. ("SG Strategic")**, a Proprietary Products issuer, is, according to private placement memoranda, a "private closed-ended investment exempt company incorporated in the Cayman Islands" that issued four series of notes to non-U.S. investors during the Relevant Period.  SG Strategic primarily invested in "non[-]registered private mortgage backed notes" issued by South Bay through Sentinel and in membership interests issued by South Bay.  Roberto Cortes, Weisson and Juan Cortes beneficially own SG Strategic.

16.      **GMS Global Step Up Note, Ltd. ("GMS")**, a Proprietary Products issuer, is, according to private placement memoranda, a "private closed-ended investment exempt company incorporated in the Cayman Islands" that issued three series of notes to non-U.S. investors during the Relevant Period.  GMS primarily invested in "non-registered private mortgage backed notes" issued by South Bay.  Roberto Cortes, Weisson and Juan Cortes beneficially own GMS.

## Facts

### A. The Common Beneficial Ownership and Effective Control of BCI, the Proprietary Products Issuers and South Bay Created a Conflict of Interest for BCI.

17.      Roberto Cortes and Weisson formed and began operating South Bay, a residential real estate development company, in approximately 1999.  Between 1999 and approximately 2005, South Bay concentrated on residential real estate development in Key Biscayne, Florida.  South

Bay's business activities expanded significantly in 2006 and 2007 when South Bay acquired 29 lots and associated club memberships in an exclusive resort in South Florida (the "Resort"). Until approximately 2007, South Bay's business activities were financed primarily through commercial bank loans and investments from friends and family.

18.    The Primary BCI Principals and a related individual formed Sentinel, the first of the Proprietary Products issuers, in approximately 2006 for the primary purpose of financing South Bay's activities through the issuance of preferred shares to non-U.S. investors. Starting in 2010, they formed additional Proprietary Products issuers, including SG Strategic and GMS, for the purpose of financing South Bay's activities through the issuance of notes to non-U.S. investors. During the Relevant Period, Roberto Cortes and Weisson each beneficially owned 40 percent of the Proprietary Products issuers and Juan Cortes beneficially owned 10 percent. These three principals were also directors of Sentinel during the Relevant Period. An affiliated entity under the effective control of the beneficial owners provided administrative and accounting support to the Proprietary Products issuers. The Primary BCI Principals, as the beneficial equity owners of the Proprietary Products issuers, stood to receive any profits generated by those entities. The basic beneficial ownership structure of the Proprietary Products is as follows:[4]



19.    Generally, the Proprietary Products issuers invested the proceeds of the notes sold to non-U.S. investors in promissory notes issued by South Bay backed by non-registered mortgages,[5] although certain Proprietary Products issuers invested in membership certificates issued by South Bay.

20.    The Primary BCI Principals, and a related individual, also beneficially owned Spyglass, an offshore investment adviser to certain of the Proprietary Products issuers. Spyglass delegated all of its responsibilities to Roberto Cortes during the Relevant Period, including responsibility for valuing the investments that certain of the Proprietary Products issuers made in South Bay.

---

[4] The Proprietary Products issuers were beneficially owned by these individuals through a holding company that is not represented in this chart. None of the Proprietary Products' offerings was registered under the Securities Act of 1933 and, under the terms of the offering memoranda, the securities were prohibited from sale to U.S. persons.

[5] The non-registered mortgages executed by South Bay in favor of the Proprietary Products issuers were not recorded in Florida. Any recorded mortgages on the properties at issue would have priority over non-registered mortgages.

21.     Starting in approximately 2005, Roberto Cortes, Weisson, and Juan Cortes formed several non-U.S. financial services entities operating under the Biscayne Capital name.  Together with Chatburn, they formed BCI in 2008.  Roberto Cortes and Weisson beneficially owned through South Bay approximately 61 percent of BCI and the affiliated non-U.S. financial services entities during the Relevant Period.  Juan Cortes and Chatburn each beneficially owned between 8 and 9 percent of BCI and the affiliated non-U.S. financial services entities during the Relevant Period. The basic beneficial ownership structure of the Biscayne Capital entities is as follows:[6]



22.     As the majority beneficial owner of the Biscayne Capital entities, South Bay invested millions of dollars in capital contributions for the benefit of those entities during the Relevant Period.

23.     The common beneficial ownership and effective control of BCI, the Proprietary Products Issuers and South Bay created a conflict of interest that, under the Advisers Act, should have been disclosed when BCI recommended and sold the Proprietary Products to BCI clients.

**B.  South Bay's Financial Condition During the Relevant Period Created a Conflict of Interest for BCI.**

24.     By 2009, the combination of the global financial crisis, the accompanying disruption of the South Florida real estate market, and numerous development delays relating to the Resort caused financial difficulties for South Bay.

25.     Between approximately 2007 and late 2009, Weisson and Roberto Cortes, the co-owners of South Bay, spent significant time and resources drafting development plans, seeking permits, and making preparations to develop 17 contiguous lots of the 29 total Resort lots as a single project.  One plan involved developing fractional ownership units.  Another plan involved developing a luxury retirement community.  However, the single project development plans ultimately did not move forward for various reasons.  Consequently, in 2010, South Bay began drafting new development plans to build single family homes on the lots over a six-year period, with rental income starting in late 2012 and home sales starting in 2013 and continuing through

---

[6] The Biscayne Capital entities were beneficially owned by these individuals and entities through a holding company that is not represented in this chart.

2016.  The development delays stretched into the heart of the financial crisis, leaving South Bay with little revenue and increasing carrying costs.[7]

26.     As later reported in its audited financials, throughout the Relevant Period, South Bay failed to generate enough revenue or operating cash flows to pay off maturing debt, sustain its operations or fund its development plans without obtaining additional financing.  Audits completed subsequent to the Relevant Period showed that South Bay had significant net negative cash flows from operations in 2010, 2011 and 2012.  During this period, its annual interest costs rose to approximately $12.6 million in 2010, $10.7 million in 2011, and $11.5 million in 2012.[8]  South Bay was also required to renegotiate certain past due financial obligations prior to and during the Relevant Period.[9]

27.     South Bay's financial condition during this period created a conflict of interest for BCI under the Advisers Act, and, thus, should have been disclosed when it recommended and sold the Proprietary Products to BCI clients.

### C.  BCI's Dependence on South Bay for Financial Support During the Relevant Period Created a Conflict of Interest for BCI.

28.     BCI did not generate revenues sufficient to sustain operations during the Relevant Period without obtaining additional funding.

29.     South Bay, as the majority beneficial owner of BCI, provided capital contributions to BCI necessary to support its operations during the Relevant Period.

30.     BCI's dependence on South Bay for capital contributions during the Relevant Period created a conflict of interest for BCI that, under the Advisers Act, should have been disclosed in connection with the recommendation and sale of Proprietary Products to BCI clients.

### D.  Roberto Cortes, Weisson and Juan Cortes Developed, Marketed, and Sold Proprietary Products to Finance South Bay's Operations.

31.     In 2010 and 2011, while South Bay was struggling to service its existing debt obligations and repay maturing debt to Sentinel, the Primary BCI Principals formed Proprietary Products issuers for the primary purpose of raising additional investor funds to sustain South Bay's operations, meet its existing loan obligations and finance its new real estate development plans.

---

[7] In contrast to the six-year single family home development plan for the Resort lots, South Bay had previously expected all of the homes in the luxury retirement community project to be sold in advance of construction with construction financed by the individuals who purchased the homes and to take 12 to 15 months to complete.

[8] This includes interest incurred and charged to operations as well as interest incurred and capitalized.

[9] The largest past-due obligations concerned loans made by Sentinel to South Bay between 2007 and 2010.  The past-due obligations, which exceeded $41 million by September 2010, were renegotiated on several occasions, each time with Roberto Cortes acting on behalf of Spyglass and Sentinel, and Weisson acting on behalf of South Bay.

32.     The Primary BCI Principals formed SG Strategic in the Cayman Islands in March 2010 and issued its first series of notes – Sentinel Investment Fund SPC Linked Series 7.3 Notes ("SG Series 7.3") – to non-U.S. investors starting in July 2010.  SG Strategic invested the proceeds from the first series of notes in preferred shares of Sentinel.  BCI, through Chatburn, recommended and sold SG Series 7.3 Notes to non-U.S. BCI clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

33.     SG Strategic issued three additional series of notes in June 2011: (1) SBH Diversified Preferred Income 2014 (offering commenced in June 2011 and matured in May 2014); (2) SBH Diversified Preferred Income 2016 (offering commenced June 2011 and matures in May 2016); and (3) SBH Diversified Preferred Income 2018 (offering commenced in June 2011 and matures in May 2018) ("SBH 2014," "SBH 2016," and "SBH 2018," respectively).  SG Strategic invested the proceeds from those three series directly in membership certificates issued by South Bay.  South Bay treated the investment as an equity investment for purposes of its financial statements.  BCI, through Chatburn, recommended and sold SBH 2016 and SBH 2018 to its non-U.S. clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

34.     The Primary BCI Principals also formed GMS, which issued three series of notes in December 2011.  The proceeds of these note issuances primarily were invested in Sentinel and in non-registered private mortgage backed notes issued by South Bay.  BCI, through Chatburn, recommended and sold GSM Global Step Up Note, Ltd. Series 3 ("GMS Series 3") to its non-U.S. clients without disclosing various conflicts of interest or material information under the Advisers Act related to South Bay's financial condition.

E.  **BCI Willfully Breached its Fiduciary Duty Under the Advisers Act By Failing to Disclose Conflicts of Interest and Material Information Concerning South Bay's Financial Condition When Recommending to Its Clients the Proprietary Products.**

35.     Chatburn, a BCI investment adviser representative, exercised his discretionary authority to purchase[10] or otherwise recommended the purchase of approximately $3.49 million in Proprietary Products in 29 separate BCI client accounts between August 30, 2010 and March 27, 2012.  Chatburn also recommended that certain BCI client accounts sell approximately $104,000 in Proprietary Products during that period.  Chatburn's recommendations to BCI clients related to four Proprietary Products: (1) SG Series 7.3 Notes; (2) SBH 2016; (3) SBH 2018; and (4) GMS Series 3.

36.     As a U.S. investment adviser, BCI had a fiduciary duty under the Advisers Act to exercise the utmost good faith in dealing with clients – including to fully and fairly disclose all material information which might incline an investment adviser consciously or unconsciously to render advice which is not disinterested and to employ reasonable care to avoid misleading clients.  As a BCI investment adviser representative, Chatburn had the same fiduciary duty to his and BCI's clients.  It is the client, not the investment adviser, who is entitled to determine whether a conflict

---

[10] Chatburn had discretion over most of his clients' accounts.

of interest might cause an investment adviser – consciously or unconsciously – to render advice that is not disinterested.

37.     In recommending to its clients the Proprietary Products described above, BCI failed to disclose the previously articulated conflicts of interest relating to the Proprietary Products as well as material information concerning South Bay's financial condition.  In doing so, BCI breached its fiduciary duty under the Advisers Act to those clients.

38.     All the Proprietary Products' offering memoranda during the Relevant Period were silent as to BCI's conflicts of interest and South Bay's financial condition.  Chatburn failed to disclose to clients various conflicts of interest, such as South Bay's financial condition or the fact that the Proprietary Products issuers were formed and beneficially owned and controlled by the Primary BCI Principals.  Similarly, Chatburn failed to disclose that Roberto Cortes and Weisson were responsible for determining the value of certain of the Proprietary Products issuers' investments in South Bay.  Further, Chatburn failed to disclose that the Primary BCI Principals owned Spyglass or that Spyglass had delegated its responsibilities to Roberto Cortes during most of the Relevant Period.

39.     Chatburn also failed to disclose material information under the Advisers Act relating to South Bay's financial condition to BCI clients who purchased the Proprietary Products.

**F.  Roberto Cortes, Weisson, and Juan Cortes Willfully Aided and Abetted and Caused BCI's Failure to Disclose Conflicts of Interest and Material Information Under the Advisers Act Regarding South Bay's Financial Condition.**

40.     Roberto Cortes, Weisson, and Juan Cortes developed the Proprietary Products to finance South Bay's real estate operations.  An essential component of their effort was to sell the Proprietary Products through their financial advisers, five of whom, including Chatburn, they knew were employed by both BCI and the affiliated non-U.S. Biscayne Capital financial services entities.  Roberto Cortes, Weisson, and Juan Cortes encouraged the sale of Proprietary Products  by providing these financial advisers offering memoranda, term sheets and presentations concerning South Bay.  However, Roberto Cortes, Weisson, and Juan Cortes failed to take steps to ensure that the Proprietary Products were not sold through BCI or, in the alternative, to train BCI investment adviser representatives to make adequate disclosures under the Advisers Act in connection with any such BCI sales.  For example, they failed to take steps to inform BCI investment adviser representatives that Proprietary Products sales should be made only through the affiliated non-U.S. financial services entities and no recommendations or sales should be made through BCI.  Nor did they take steps to prevent trade tickets relating to Proprietary Products from being entered for BCI or to monitor BCI for Proprietary Product sales.  They failed to provide training to BCI's investment adviser representatives to highlight regulatory differences between recommending Proprietary Products through their affiliated non-U.S. financial services entities and those required when recommending and selling through BCI, a U.S. registered investment adviser.  Further, they knew that BCI's compliance manual was silent as to the sale of Proprietary Products through BCI.

41.     Roberto Cortes, Weisson and Juan Cortes failed to detect that Chatburn engaged in Proprietary Product sales through BCI client accounts during a period of more than 18 months

even though they knew that, at least as of July 30, 2010, Chatburn's assets under management at BCI amounted to more than half of BCI's total assets under management at that time and even though Roberto Cortes and Juan Cortes were designated as his supervisors at BCI. They also knew that Chatburn had a significant portion of clients' assets invested in Proprietary Products during the Relevant Period. Nonetheless, they did not review or otherwise direct that a review be conducted of Chatburn's BCI accounts to ensure that no Proprietary Products were being sold through BCI.

### G. Chatburn Willfully Aided and Abetted and Caused BCI's Failure to Disclose Conflicts of Interest and Material Information Under the Advisers Act Concerning South Bay by Failing to Conduct a Fundamental Analysis or Reasonable Due Diligence Concerning the Proprietary Products.

42.     Chatburn knew or was reckless in not knowing that BCI failed to disclose conflicts of interest and material information under the Advisers Act concerning South Bay's financial condition when recommending Proprietary Products to BCI's non-U.S. clients.

43.     Chatburn knowingly or recklessly failed to conduct a "fundamental analysis" or reasonable due diligence under the Advisers Act of the Proprietary Products before recommending them to BCI clients, in contravention of BCI's affirmative disclosures in its Form ADV. Part 2A of BCI's Form ADV dated March 2011, which was delivered to clients, stated that BCI's "Financial Advisors conduct fundamental analysis on all securities recommended for client accounts." In the case of stocks and bonds, BCI's Form ADV represented that the analysis generally included a review of the issuer's management, the amount and volatility of past profits or losses, the issuer's assets and liabilities, as well as any material changes from historical norms, prospects for the issuer's industry, as well as the issuer's competitive position within the industry, and any other factors considered relevant. Chatburn took no steps to review similar information relating to the Proprietary Products issuers.

44.     Aside from having knowledge of the coupon rate, the maturity term, and the fact that the Proprietary Products invested in some form in South Bay, Chatburn failed to conduct a "fundamental analysis" of essential features of those products, before recommending them to BCI clients. For example, even though the Proprietary Products notes issued to investors were unsecured debt obligations of the Proprietary Products issuers, Chatburn had an insufficient understanding that BCI's clients had credit risk with respect to the Proprietary Products issuers. Additionally, Chatburn had no understanding as to who owned and managed the Proprietary Products issuers, or the role of Spyglass, the investment adviser to several of the Proprietary Products issuers. Similarly, Chatburn had an insufficient understanding as to the nature of the investments that the Proprietary Products issuers made in South Bay, and did not understand or inquire about the meaning of basic terms in the offering memoranda describing such investments, such as "non-registered private mortgage-backed notes," which was the primary investment made by the Proprietary Products issuers in South Bay. Chatburn also had no understanding as to what rights or recourse, if any, the Proprietary Products issuers had against the underlying assets of South Bay in the event of default (i.e., whether the Proprietary Products issuers had obtained collateral or whether other persons or entities had priority rights to the collateral over the Proprietary Products issuers). Instead, Chatburn relied on his personal relationship with Roberto

Cortes and Weisson, his personal belief that they would be successful in South Bay, and the fact that he visited and observed the South Bay construction sites.

45.     Further, Chatburn knowingly or recklessly ignored information available to him that should have caused him – in exercising his fiduciary duty of care under the Advisers Act as an investment adviser representative – to conduct heightened due diligence on the Proprietary Products that he recommended to BCI clients. That information included, but is not limited to the following: (1) the Proprietary Products issuers were newly formed small private issuers with no operating history; (2) Spyglass, the investment adviser to several of the Proprietary Products issuers, also was a newly formed company at the time that Sentinel commenced, with no operating history; (3) the investment funds raised by these newly formed Proprietary Products issuers were to be invested in South Bay, a privately owned real estate business that Chatburn knew to be under common beneficial ownership and control with BCI; (4) several of the offering memoranda prior to June 2012 failed to mention South Bay, even though Chatburn knew that to be the primary, if not exclusive, investment being made by the Proprietary Products issuers; and (5) the Proprietary Product offering memoranda indicated that the issuers would not be audited. Chatburn also had no understanding as to South Bay's underlying financial condition, its profitability, or its creditworthiness, and conducted no investigation or inquiry of South Bay's finances despite the severe real estate crisis in South Florida during the Relevant Period. Notwithstanding those red flags, Chatburn failed to conduct any investigation relating to the Proprietary Products issuers before recommending Proprietary Products to BCI clients.

46.     In making his recommendations to BCI clients concerning the Proprietary Products, neither Chatburn nor BCI disclosed Chatburn's personal conflicts of interest arising from his beneficial ownership interest in BCI. Chatburn knew that he had some beneficial ownership interest in BCI. He also knew that South Bay invested in BCI and that the Proprietary Products that he recommended to non-U.S. BCI clients financed South Bay. Further, Chatburn failed to disclose that he received additional compensation from one of the affiliated non-U.S. Biscayne Capital financial services entities beyond his share of the disclosed BCI investment management fees charged to BCI clients in connection with the recommendation of Proprietary Products to BCI clients. Chatburn breached his fiduciary duty under the Advisers Act to those clients in failing to disclose information regarding his personal conflicts of interest.

**H. Failure to Supervise Frank Chatburn.**

47.     As a result of the conduct described above, BCI, Roberto Cortes, and Juan Cortes failed reasonably to supervise, with a view to preventing violations of the Advisers Act, the activities of Frank Chatburn during the Relevant Period. Both Roberto Cortes, in his capacity as CEO, and Juan Cortes, in his capacity as CCO, were designated by BCI as supervisors of Frank Chatburn.

48.     Between August 2010 and March 2012, Chatburn recommended and sold approximately $3.49 million in Proprietary Products to approximately 29 non-U.S. BCI client accounts. As previously discussed, BCI established no procedures relating to the sale of Proprietary Products through BCI and had no system for applying such procedures that would reasonably be expected to prevent and detect, insofar as practicable, violations relating to the sale

of Proprietary Products. With respect to Form ADV representations concerning the monitoring and review of BCI accounts, neither Roberto Cortes nor Juan Cortes took adequate steps to conduct such monitoring and reviews with a view to preventing violations of the securities laws.

## I. BCI Failed to Adopt and Implement Written Policies and Procedures Reasonably Designed to Prevent Violations of the Investment Advisers Act.

49.    BCI failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Investment Advisers Act.

50.    Juan Cortes was responsible for developing a compliance program for BCI and operated as its Chief Compliance Officer until late 2011. However, he had no specific training as a compliance officer. BCI's compliance manual provided that the Chief Compliance Officer was responsible for the successful implementation of the policies and procedures contained in the manual as well as for training employees on compliances issues, ensuring that employees with specific compliance responsibilities competently performed their jobs, and ensuring the timely review of compliance issues. The Compliance Manual further provided that the Chief Compliance Officer was responsible for ensuring that BCI's compliance program remained "robust, comprehensive, and current, and reasonably designed to identify conflicts of interest and other areas that may expose [BCI] to increased regulatory and compliance risk." Nonetheless, Juan Cortes failed to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder, especially surrounding the sale of products in which BCI or its principals had a financial interest.

51.    Further, BCI's compliance manual – purchased off-the-shelf from a third party – was not reasonably tailored to BCI's business practices until 2012 and BCI did not have any written policies and procedures regarding the recommendation of Proprietary Products through BCI.

## J. BCI Made Material Misstatements in Form ADV.

52.    BCI made material misstatements in Form ADV during the Relevant Period. Roberto Cortes signed BCI's Form ADV filings. Juan Cortes was primarily responsible for preparing BCI's Form ADV filings and provided factual information as requested to a third party consultant for the purpose of completing BCI's Form ADV filings.

53.    For example, BCI misrepresented in Item 8 of Part 1A of Form ADV as filed with the Commission on July 21, 2011 that neither BCI nor any "any *related person* … recommends securities (or other investment products) in which [BCI] or any *related person* has some proprietary (ownership) interest …."[11] Chatburn had recommended securities issued by the Proprietary Products issuers, which were beneficially owned by the other BCI principals, to BCI clients prior to July 21, 2011 and continued to recommend them after that date.

---

[11] The instructions to Form ADV define related person as any advisory affiliate and any person that is under common control with the firm. Advisory affiliates are defined as (1) all of the adviser's officers, partners, or directors or any persons performing similar functions; (2) all persons directly or indirectly controlling or controlled by the adviser; and (3) all of the adviser's current employees.

54.     BCI misrepresented that it had $150 million in AUM in its March 2011 Form ADV Part 2A based on sub-advisory agreements with certain of the affiliated non-U.S. Biscayne Capital financial services entities and in its July 21, 2011 Form ADV even though BCI never actually provided such services.

55.     BCI also misrepresented the assets managed by Frank Chatburn in prior jobs in Part 2B of Form ADV. Form ADV represented that Chatburn managed "a $200 million book of business" at Wachovia. In reality, Chatburn only managed approximately $50-60 million at Wachovia and never reviewed his biographical information in Form ADV.

56.     BCI misrepresented in Part 2A of Form ADV that BCI's investment adviser representatives "conduct fundamental analysis on all securities recommended for client accounts." Chatburn did not conduct a fundamental analysis of the Proprietary Products or the Proprietary Products issuers. Rather, he visited South Bay's development sites and trusted that South Bay would be successful based on his relationship with Roberto Cortes and Weisson.

57.     BCI misrepresented that "[a]ccounts under Biscayne Capital's management are monitored on an ongoing basis by the Management members and the Compliance Department" when in reality BCI did not have a functioning compliance department and did not adequately monitor BCI's accounts on an ongoing basis.

58.     BCI misrepresented that Roberto Cortes was the Chief Compliance Officer in the Form ADV from 2008 until July 2011, when in fact Juan Cortes was the Chief Compliance Officer.

### Violations

59.     As a result of the conduct described above, BCI willfully violated Sections 206(1) and 206(2) of the Advisers Act, which make it unlawful for any investment adviser, directly or indirectly, to (1) "employ any device, scheme, or artifice to defraud any client or prospective client" or (2) "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." Also as a result of the conduct described above, Frank R. Chatburn willfully aided and abetted and caused BCI's violations of Sections 206(1) and 206(2) of the Advisers Act. Roberto G. Cortes, Ernesto H. Weisson, and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of Section 206(2) of the Advisers Act.

60.     As a result of the conduct described above, BCI willfully violated, and Roberto G. Cortes and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of, Section 207 of the Advisers Act, which makes it "unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission … or willfully to omit to state in any such application or report any material fact which is required to be stated therein."

61.     As a result of the conduct described above, BCI willfully violated, and Juan Carlos Cortes willfully aided and abetted and caused BCI's violations of, Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, which require investment advisers to, among other things, adopt

and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and its rules.

62.     As a result of the conduct described above, BCI, Roberto G. Cortes, and Juan Carlos Cortes failed reasonably to supervise Chatburn, with a view to preventing violations of the federal securities laws, while Chatburn was subject to their supervision, within the meaning of Section 203(e)(6) of the Advisers Act.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 203(e), 203(f) and 203(k) of the Advisers Act, and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A.     Respondent BCI cease and desist from committing or causing any violations and any future violations of Sections 206(1), 206(2), 206(4) and 207 of the Advisers Act and Rule 206(4)-7 promulgated thereunder.

B.     Respondent BCI is censured.

C.     Respondent Frank R. Chatburn cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act.

D.     Respondent Frank R. Chatburn be, and hereby is:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and

> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after four (4) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

E.     Respondent Roberto G. Cortes cease and desist from committing or causing any violations and any future violations of Sections 206(2), and 207 of the Advisers Act.

F.     Respondent Roberto G. Cortes be, and hereby is:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and
>
> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

G.    Respondent Juan Carlos Cortes cease and desist from committing or causing any violations and any future violations of Sections 206(2), 206(4) and 207 of the Advisers Act and Rule 206(4)-7 promulgated thereunder.

H.    Respondent Juan Carlos Cortes be, and hereby is:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and
>
> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission

I.    Respondent Ernesto H. Weisson cease and desist from committing or causing any violations and any future violations of Section 206(2) of the Advisers Act.

J.    Respondent Ernesto H. Weisson be, and hereby is:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and
>
> prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter,

with the right to apply for reentry after three (3) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

K.      Any reapplication for association by Respondents Frank R. Chatburn, Roberto G. Cortes, Juan Carlos Cortes, and Ernesto H. Weisson will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following:  (a) any disgorgement ordered against the Respondent, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

L.      Respondent BCI shall, within ten (10) days of the entry of this Order, pay disgorgement of $30,024 and prejudgment interest of $3,063 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

M.      Respondent Frank R. Chatburn shall, within ten (10) days of the entry of this Order, pay disgorgement of $78,924 and prejudgment interest of $8,052 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

N.      Respondent BCI shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $125,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

O.      Respondent Frank R. Chatburn shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $100,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

P.      Respondents Roberto G. Cortes, Juan Carlos Cortes, and Ernesto H. Weisson shall each, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $50,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Q.      Payment must be made in one of the following ways:

        (1)     Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying BCI, Roberto G. Cortes, Juan Carlos Cortes, Ernesto H. Weisson, or Frank R. Chatburn as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Michael J. Osnato, Chief, Complex Financial Instrument Unit, Division of Enforcement, Securities and Exchange Commission, 200 Vesey Street, Suite 4000, New York, New York 10281.

R.    Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents BCI, Frank R. Chatburn, Roberto G. Cortes, Juan C. Cortes and Ernesto H. Weisson agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of their payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents BCI, Frank R. Chatburn, Roberto G. Cortes, Juan C. Cortes and Ernesto H. Weisson agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary